## WHITWORTH *vs.* THE STATE OF GEORGIA.

Where the Court refuses a continuance in a capital case, on account of the absence of testimony material for the prisoner's defense, a new trial will be granted.

Murder, in Chattooga Superior Court. Tried before Judge CROOK, at the March Term, 1859.

This was an indictment charging the defendant in the Court below, with the murder of E. M. Hall.

When the case was called for trial, the defendant moved the Court to continue the same, and for that purpose submitted a showing, in writing, sworn to and subscribed before the Clerk in open Court, stating that he was "not ready for the trial of said case; that Lucinda Gaddis, who had been subpœnaed, and lived in the county of Cass, was a material witness for him; that he had been informed and believed that she was unable to attend said. term of said Court, on account of her sickness; that he expected to be able to prove by the witness, that on the 31st day of .March, 1857, she went to the residence of E. M. Hall and found him lying in the dwelling house dead, and Mary Hall, his widow, and one Mr. Holloway, were standing in the dark, or came together from some unknown place in the dark, and stopped behind the kitchen, and that the witness overheard them talking about renting the land, and buying and selling whisky, say-

Whitworth *vs.* The State of Georgia.

ing, "What shall we do with the land? Shall we, or had we better rent the land?" Also saying, " we can buy whisky at so much by the gallon, and sell at such and such profit," and talking of " living and doing business together"; and that they, Holloway and Mrs. Hall, were both very near drunk; that Mrs. Hall then went down to the grocery, Askew Brock and Holloway with her; that witness then went down to the grocery to bring Mrs. Hall to the house, and when she got to the grocery she saw Mrs. Hall lying on the floor drunk; that Brock and witness carried Mrs. Hall to the house and put her to bed, where she (Mrs. Hall) remained until 10 o'clock in the day; that Mr. Robert A. Brock is also absent, by whom the defendant expected to prove certain facts set forth in a former showing for a continuance; that the defendant expected to have the benefit of the testimony of Dr. G. B. T. Maddox, by whom he expected to prove that, if the blow was struck at the grocery it would have bled before they got to the house, some 150 yards from the grocery; that the showing was not made for delay, but for the purpose of obtaining justice; that Dr. Maddox, as defendant understood, was sick and unable to come into Court; that there was no other evidence to satisfactorily establish the facts detailed in the showing."

The motion was overruled, and the continuance refused.

### EVIDENCE FOR THE STATE.

Mary Hall testified that: On the 30th of March, 1857, in the county of Chattooga, and about 3 o'clock, the deceased, Holloway, Brock and Butler, were all at the grocery of the deceased, and remained there until about dark, when deceased called to witness to bring a light to the grocery; that she went down to the grocery and found deceased fastened up in the grocery; that deceased opened the door and requested witness to come in with the light, that he might look for a gun; that Brock came in, and after looking, said there was no gun there; deceased found no gun; deceased and witness then went out of the grocery, and started toward the house, which was some 75 yards distant; when they had gone about ten steps on the way, deceased stopped, saying there was a pound weight about there, and when in the act of looking for the weight, some person, at that time unknown to

witness, but which turned out to be the prisoner, stepped up and struck deceased on the right side of the head with a gun, and when witness said something to the person striking, he replied, " If you say anything I will knock you down." Witness and Brock carried deceased to the house, and he never spoke after the blow was given; witness threw down the light (which was a pine torch) when the blow was struck. After the deceased was taken to the house, the prisoner and Holloway came to the house, and the prisoner brought the gun into the house, and, in a little while after, dropped it down on the floor, and left. The gun exhibited was Holloway's gun, (as he said) and it was the gun used on the occasion. Prisoner did not return to the house that night; witness saw Holloway frequently that night—he and Brock, and Butler stayed all night. Dr. Watts being sent for, came to see the deceased in about one hour after the blow was given. When the deceased was first carried to the house after the blow was given, witness set him down in a chair until a matrass was fixed, and then laid him on the matrass; put some soot and water on his head before he was laid on the matrass; he bled a great deal, and was moved several times because he bled so much; he was also moved by Dr. Watts in fixing the wounds. Witness never saw prisoner until the night of the difficulty; had seen Brock and Holloway before; they moved into the neighborhood about Christmas; had not seen either of them since the night of the difficulty; deceased was engaged in the business of retailing liquors; heard the deceased say that he had credited Holloway and Brock as long as he was going to, and intended to tell them so when he saw them ; witness got the grocery key out of the pocket of deceased, before he died, and gave it to Brock and Holloway to go and get liquor to give to the deeeased ; witness went to the grocery next morning, in company with Mrs. Watts, to get some coffee; witness drank some liquor that night because she was sick, but did not drink much, and knew all that occurred after day-light. When prisoner was brought back next morning after the difficulty, he said, in the presence of Esquires McClung and Knowles, that he had done the murder ; witness did not say, next morning, to the persons at the house that they could leave, nor that she would order the Coroner off if he came; nor did she say on that morning that Mr. Hall was dead

and gone to hell, and that she was glad of it; never told Mrs. McClung about eight days before deceased's death, that he and witness would not live long together, nor that somebody would kill him, or drive him off; nor that he should leave witness. Mr. Bryant was the brother of witness' first husband—lived in call of the house; and in the lifetime of witness' first husband, she usually called on Mr. Bryant for any wanted assistance, but after her marriage with deceased, she did not call on Bryant, as he and deceased had had a falling out; did not go to the grocery on the night of the difficulty and set out liquor, saying, " this is the widow Hall's grocery;" witness was in bed next morning, but did not recollect about going to bed; witness was not cognizant of what transpired a portion of the time after deceased's death ; when prisoner admitted striking deceased, he gave no excuse for the act, but said he could not deny it with a clear conscience.

Dr. Maddox testified that, he saw Mr. Hall, after his death, about two or three o'clock ; had a wound on the right side of his head, which caused his death ; both tables of the cranium were fractured ; one fracture was about four, and the other about six inches long; he saw him on the 31st of March, 1857, in Chattooga county ; the wound on deceased's head ranged from the right ear over the top of the head, and might have been made with one or with two licks, and from its appearance witness thinks it must have been given from the side of the deceased on the right; if the wound did not bleed at once, the motion in carrying deceased to the house would have started it to bleeding ; the room where deceased lay was very bloody, but witness, upon looking, saw no blood between the grocery and the dwelling; if the wound had been made with a sharp instrument, the blood would have appeared much sooner than if given with the barrel of a gun.

John D. Knowles testified that, he was one of the magistrates who committed the prisoner on the 31st of March, 1857, in Chattooga county ; prisoner, on that occasion, admitted that he struck deceased a lick ; his words were, " if you must have it, I struck him a lick;" he seemed excited and uneasy, and did not appear to know what he was doing ; said he wanted a certain man to have his gun, and wanted to know how long it would be before they would hang him ; witness, with four or five others, reached the house of Hall

about sun-up on the morning after the difficulty; found Mrs. Hall in bed, and drunk, and she did not get up while witness stayed; she said there was no use for a Coroner, nor for those who were there; there was blood all over the floor; saw blood on the facing of the grocery door, as though rubbed off from one's clothes; saw one little spot of blood about eight steps from the grocery door, but saw no more between the grocery and the house; has known Mrs. Hall for 17 or 18 years, and had the means of knowing her general character, which is not very good, and from his knowledge of her general character could not believe her on her oath; never heard anything against her truthfulness until after this difficulty.

Wesley Temples testified that, on the morning after the difficulty he was at the place deceased was said to have been killed, which was about ten steps from the grocery; saw a small spot of blood there, also the mainspring of a gun-lock, which was then and there picked up; saw some blood on the gate-post about the latch of the gate, and about the height that one would be carried, if carried through the gate; saw no other blood between the dwelling and the grocery, except that already mentioned.

Daniel Collins testified the same as Temples, and also that he saw some blood which seemed to have been rubbed on the facing of the door of the house about four inches from the floor, and also some blood on the facing of the grocery door, which appeared to have been put on with hands, about as high up as one would put the hand in opening the door; prisoner was brought back by Clopton Henly and others, and was identified by Mrs. Hall.

E. M. Fant testified that, he was present on the morning after the difficulty, and heard the prisoner admit that he gave deceased the blow; the prisoner did not look like he knew what he was doing, and wanted to know if they were going to hang him that evening.

Jeremiah Murphy testified that, the prisoner passed his house a short time before those in search for him; he was going in a direction from the house of deceased on the morning after the difficulty, and inquiring the way to Alabama; witness heard him say, when he was brought back, "you had as well hang me now as any other time;" he appeared to be in great distress; saw the spot of blood near the grocery; saw blood on the facing of the grocery door, and on the gate-

post. Has known Mrs. Hall since 1850, and from his knowledge of her general character would believe her on her oath.

Larkin Davis testified that, he was present when prisoner was examined before the magistrates, and when asked as to his guilt, he replied, "I reckon I must say it was me that struck the blow;" and after he was spoken to again, he said, "I don't want to die with a lie in my mouth."

David W. Strange testified that, he lived in the neighborhood and knew Mrs. Hall's general character, and would believe her on her oath.

Alfred Cook testified that, at the examination of prisoner, when questioned as to his guilt, he replied, "Yes, I struck the lick, and it is too plain to deny;" and when some one remarked, "poor fellow," he then said he was drunk, and did not know whether he did it or not; witness saw the blood near the grocery, and saw a pound weight picked up near the blood spot; had lived in the neighborhood about four years, and about one and a half miles from deceased; knew Holloway who had been about there two or three months; on the day of prisoner's examination Holloway was present, and under arrest, but was discharged after prisoner was taken off; prisoner did not live in the neighborhood, and witness never saw him until that day; he was inquiring the way to Alabama; Mrs. Hall has had a bad name, both before and since the difficulty.

### EVIDENCE FOR THE DEFENDANT.

John D. Knowles testified that, he saw two pound weights lying on the ground, the day after the difficulty, about twenty or twenty-five yards from the grocery, rather angling from the grocery toward the house.

A. B. Maloney testified that, he was at the house of deceased on the morning after the difficulty, and saw blood on the grocery door, which seemed to have been smeared; Mrs. Hall was sitting at the head of her husband's corpse; she was in liquor, and said for those persons who were there to leave; that they had got Hall; he was dead, and she reckoned was in hell; had known Mrs. Hall's general character for several years, and would not believe her on oath.

Mrs. McClung testified that, she was at deceased's house about eight days before the killing; that then and there Mrs.

Hall told witness that she was not going to live with Mr. Hall long; that he was quarrelsome, and she would get shut of him, or that somebody would kill him; that the place where deceased lived, was her (Mrs. Hall's) place, and she would not leave there; had seen Mrs. Hall drunk twice; had known Mrs. Hall ten or eleven years; was acquainted with her general character and would not believe her on oath.

Jonas McClung testified that, he was at the house of deceased on the morning after the difficulty, and found deceased dead, and his wife lying on the bed in the same room about as drunk as people ever get to be; saw blood a few steps from the grocery, and some on the door of the grocery; was acquainted with Mrs. Hall's general character, and would feel at liberty to doubt her oath; on the night of the difficulty, witness was burning a coal kiln; prisoner came there drunk, said he was lost and wanted to go to Holloway's; also inquired the way to Alabama, and set at witness to go with him to Holloway's.

Thomas Gaddis testified that, he lives about one and a half miles from deceased's house; that he and his wife, and Askew Brock, who came after witness and his wife, went to the house of the deceased, arriving about one hour and a half before day on the morning after the difficulty; found Holloway and Butler there; Mrs. Hall was intoxicated, and with Brock and Holloway, went down to the grocery; soon after witness went down also, and found Mrs. Hall leaning on a barrel; went back to the house and after a little while returned to the grocery and found Mrs. Hall lying on the floor, and Holloway on her; as soon as day come, Holloway and Brock took Mrs. Hall to the house, and witness went home; witness took Butler, Brock, Holloway and Mrs. Hall, all to be drunk; when prisoner was brought back, Mrs. Hall pointed him out as the man who killed her husband, to which prisoner made no reply.

Allen Bryant testified that, he lived about a quarter and half-quarter of a mile from deceased, and had known Mrs. Hall sixteen years; her first husband was brother of witness; heard of the difficulty about 8 o'clock next morning; before that time witness was usually called on for any wanted assistance by Mrs. Hall; knew the general character of Mrs. Hall, and would hardly believe her on oath; witness was not friendly with deceased for a month before the diffi-

culty; heard prisoner admit on his examination before the magistrates, that he struck the lick; saw a gun said to be the one used.

Richard Echols testified that, he knew Mrs. Hall's general character, and would not believe her on oath.

Elisha Henley testified that, he had been acquainted for about five years with Mrs. Hall's general character, and would believe her in cases where she had no prejudice, but in other cases he would not believe her on oath.

EVIDENCE FOR THE STATE IN REBUTTAL.

George Latimer testified that, he was acquainted with the general character of Mrs. Hall; had heard that she drank too much, and kept company with other men than her husband, but from his own knowledge of her, thought he would believe her on oath.

Samuel Davidson testified that, he was acquainted with the general character of Mrs. Hall, having lived within one and a half miles from her fourteen years, and although he had heard reports against her virtue, still he would believe her on oath.

The jury returned a verdict of guilty.

Defendant made a motion for a new trial in the Court below, on the following grounds:

1. Because the jury found contrary to law.

2. Because the jury found contrary to evidence.

3. Because the jury found contrary to law and evidence.

4. Because the jury found a verdict strongly and decidedly against the weight of the evidence.

5. Because the verdict is strongly and decidedly against the law and evidence.

6. Because the Court erred in refusing the defendant a continuance on the motion and showing made by him, and hereinbefore mentioned.

8. Because one of the jurors who tried the case, was not a fair and impartial juror, but had formed and expressed an opinion against the defendant before the trial of said case, which fact was unknown to prisoner or his counsel until after the trial.

The hearing of the motion for a new trial was postponed, and moved, by agreement of counsel and order of the Judge,

from time to time, until it was finally heard at Gordon Superior Court, on the 4th of April, 1859, and upon the hearing the motion, was overruled, and the new trial refused by Judge Crook; and his decision and judgment in the premises are alleged as erroneous.

F. C. SHROPSHIRE, for the plaintiff in error.

J. A. W. JOHNSON, Solicitor General, *contra.*

*By the Court*—LUMPKIN, J., delivering the opinion.

My judgment is, that a new trial should be granted in this case, on the ground, that the Court erred in refusing the motion made by the prisoner for a continuance.

Upon a dispassionate examination of the evidence in this record, can it be denied but that there is a mystery enveloping this tragedy? How, where, when, and by whom, was Hall killed? There is more or less uncertainty attending each head of this inquiry.

In candor, I confess that I think it possible, if not probable, the fatal blow was inflicted by the prisoner, and between the dwelling-house and grocery; and yet, my mind is not free from doubt, as to these material facts.

It is frankly admitted by the prosecuting officer, that no reliance can be placed upon the uncorroborated testimony of Mrs. Hall, the wife of the deceased. Such depravity has rarely been witnessed, as was exhibited on this melancholy occasion by this miserable woman. Whitworth's conviction must rest alone upon his own confessions. And under other circumstances, perhaps, they would be deemed sufficient and satisfactory, notwithstanding it is conceded he had no controversy or cause of quarrel with the deceased. If he struck at all, it must have been to avenge the offended pride of his kinsmen, Holloway and Brock, whose credit had been stopped at the grocery, or to accomplish some more unholy purpose, by removing Hall out of their way. They instigated the blow. It was inflicted with Holloway's gun. Is it impossible, in the condition the prisoner was in that night, for him to have been made to believe that he, and not Holloway or Brock, was the slayer?

This, at least, is the theory of the prisoner's defense, and

Whitworth *vs.* The State of Georgia.

a deep impression has been made upon the public mind as to its probability, if not its truthfulness.   Hence the mammoth petition from the neighborhood where the trial was had for his pardon, including, it is said, eight of the jurors who tried the case, the other four having left the country.   Hence the almost unanimous vote of the Senate and the large majority vote of the House for the bill, introduced by Mr. Echols (who was the Sheriff of Chattooga at the time) that arrested Whitworth.   The veto of the Governor, if I remember right, (I have not the message before me), was put upon technical grounds, and not upon the merits; and mainly because this writ of error was pending before this Court.

A clear legal right, then, having been withheld from the prisoner, and evidence thereby kept back from the jury, which was germain to the prisoner's line of defense, I am unwilling that his blood should be upon my hands. If, with all the testimony before the jury, they see fit to convict the defendant, it is their province and privilege to do so. But why should I desire to thrust myself into the jury-box, and usurp their functions? I have neither the wish nor, in my humble opinion, the right to do so. It is for them, and not for me, to say what weight the absent proof shall have, in determining the guilt or innocence of the accused.

Judge Story, in commenting upon the clause in the Constitution of the United States—and which is but a re-enactment of the British Statute of Edward III., which requires, in cases of treason, the confession to be made *in open Court,* to justify a conviction—speaks of this provision as founded upon the great policy of protecting men from "unguarded confessions, to their utter ruin." "It has been well remarked," he says, "that confessions are the weakest and most suspicious of all testimony; ever liable to be obtained by artifice, false hopes, promises of favor or menaces, seldom remembered accurately, or reported with due precision." *Story's Com. on the Con.,* 3d *vol.,* 671.

Read the testimony of John D. Knowles and E. M. Fant, as to the state of the prisoner's mind when these confessions were made, and no one will wonder at the subsequent excitement which has resulted from this trial and conviction.